In the Matter of MAURICE B. GLUCK, an Attorney.

First Department, May 29, 1930.

*Einar Chrystie* of counsel [*Kenneth M. Spence* and *Frederick V. P. Bryan* with him on the brief], for the petitioner.

*Maurice B. Gluck*, respondent in person.

DOWLING, P. J. The respondent was admitted to practice as an attorney and counselor at law in the State of New York, at a term

of the New York Supreme Court, Appellate Division, First Department, on May 13, 1907.

By order of this court entered June 29, 1910, he was suspended from practice for the period of one year.

There are two charges against the respondent. The first is that he has been guilty of a willful contempt of court in deliberately violating an order of a justice of the Supreme Court of this State; the second is that he fraudulently obtained a photostatic copy of a deed to certain property in New Jersey and recorded the same in the register's office of Essex county, N. J., in order that his wife might claim title to the property, with knowledge of the fact that she had no title thereto; that subsequently he fraudulently obtained possession of the property and fraudulently asserted title to it against the rightful owners.

This matter now comes before us on a motion to confirm the report of the official referee to whom it was sent to take the testimony thereon.

As to the first charge, the record shows that in 1925 there was commenced in the Supreme Court, New York county, an action entitled Melnechuck and others against Chemkowitz and others, in which action the plaintiffs sought to restrain an alleged diversion of certain church property by members of Holy Trinity Parish of the Russian Orthodox church. The respondent was the attorney for the defendants in that action. The defendants set up a counterclaim and impleaded Platon Rozdestvensky and a number of others, including Adam Phillipovsky, each of whom claimed to be the Archbishop of the North American Diocese of the Russian Orthodox church.

On May 28, 1925, respondent, as attorney for the defendants, procured default judgments which determined that Platon Rozdestvensky was not the true Archbishop of the Russian Orthodox church, and that Adam Phillipovsky was; the rights of the rival Archbishops were set forth, and Rozdestvensky was directed to deliver to Phillipovsky all of the church property held by him.

On June 15, 1925, the justice sitting in Special Term, Part II, of the Supreme Court, New York county, granted an order to show cause why the default judgments procured by respondent, as attorney for the defendants, on May twenty-eighth should not be vacated. That order to show cause contained the following stay: " Pending the hearing and determination of this motion that all proceedings on the part of said defendants on said judgments and defaults procured on said counterclaims toward enforcing same, be stayed." The order to show cause was returnable June 18, 1925. On June 18, 1925, the matter was submitted, respondent

appearing for the defendants. The moving party was given until June 22, 1925, to file affidavits. The motion was decided on July 9, 1925, and on July 21, 1925, an order was duly made and entered opening the default and vacating the judgment obtained as aforesaid on May twenty-eighth.

Meanwhile, and on July 1, 1925, while the motion to open the default was under consideration by the court, and while the stay contained in the order to show cause was still in force, Bishop Adam Phillipovsky, and various of his followers, with the help of Captain Gegan of the bomb squad of the New York police department, broke into the rectory of the Russian Cathedral, where Bishop Platon Rozdestvensky lived, on East Ninety-seventh street, between Fifth and Madison avenues, New York city. The testimony is that Bishop Adam Phillipovsky and his followers and Captain Gegan were in the rectory about noon of that day when Valerien E. Greaves, who had been sent for by Bishop Platon Rozdestvensky, arrived. Greaves' testimony is that respondent came to the premises about two o'clock in the afternoon. There was also present at the premises on that day Louis O. Bergh, a member of the law firm of Marvin & Bergh, with which Greaves was connected. Greaves and Bergh both testified that respondent directed the police officer to proceed to oust Bishop Platon Rozdestvensky and his staff from the premises; that the police officer, Captain Gegan, stated that the judgments had been given him by respondent with the request that he enforce them; that Greaves called the attention of the police officer and respondent to the fact that the judgment had been stayed; that respondent then stated that no stay had been issued; that a stay had been applied for but had been refused, and he insisted upon the police officer proceeding under the judgment. A proposal to leave the premises in the control of a third party until the matter could be referred back to court was declined by respondent who insistently demanded that the police officer " go ahead and get these people out." Respondent's testimony is that on that day he was called to the cathedral rectory by Bishop Adam Phillipovsky who wanted his advice on a deed that had been presented by somebody; that he had a discussion with Bishop Phillipovsky, Greaves and Bergh about the deed; that he gave his opinion and went away; that he had no interest in that particular property; and had nothing more to do with it. The police officer, Captain Gegan, was not called. Bishop Platon Rozdestvensky left the cathedral rectory that day. We are satisfied from the record that respondent was the directing force behind the ousting of Bishop Rozdestvensky from the Russian cathedral rectory on the day in question, in violation of the stay contained in the order to show cause issued by

the justice sitting in Special Term, Part II, of the Supreme Court, New York county.

Respondent testified that he had no knowledge that the order to show cause contained a stay. The original order was produced. On the back of it is an admission of service, purporting to be signed by respondent as attorney for the defendants. This admission of service reads as follows: " Copy received 4:35 P. M. on June 15th, 1925, Maurice B. Gluck, Attorney for Defendants." As to this respondent testified, " That is not in my handwriting, or any part of it, and I contend what they did do was to put that light paper over another, and forge that signature, because I was not in my office that day until close on to six o'clock, and when I came there, I found this paper." Pincus Cashman, now a member of the bar, who in 1925 was a clerk in the office of the attorney for the parties moving for the order to show cause, testified that he served the order to show cause on respondent and that respondent wrote the admission of service and signed the same in his presence. A handwriting expert testified that the admission of service was written by the same writer who wrote the specimens of handwriting which respondent conceded were his.

Respondent testified that in the copy of the order to show cause which he received the stay had been crossed out. The testimony of the handwriting expert is against him on this.

All doubt as to respondent's knowledge of the existence of the stay is dispelled by the testimony of Miss Minnie Israel, connected with the office of the attorney for the parties moving for the order to show cause, who communicated with respondent by telephone in an endeavor to have the motion adjourned on the return day. Her testimony is that respondent expressed a willingness to adjourn the matter if the stay were stricken out. Cashman also testified that he met respondent in court on the return day of the motion and asked him for an adjournment, and again respondent expressed a willingness to consent to the adjournment if the stay were stricken out. When the matter had been called and the court refused an adjournment but granted time to file affidavits Cashman left the court room with respondent, and during the course of their conversation the stay was again mentioned. Cashman stated he had not mentioned the stay to the justice presiding and it, therefore, stood. Respondent said, " I am going back," and Cashman said, " No, the stay stands." Whereupon respondent said: " Well, I don't care; I am going ahead, anyway. Your stay is no good." Cashman's testimony as to this is supported by the testimony of William M. Tobin, a member of the bar and a friend of Cashman, who was present during the conversation. Respondent denies all this, as

well as the details of the telephone conversation testified to by Miss Israel.

The referee states in his report: " In my opinion the first charge has been overwhelmingly proven by the testimony presented before me.

" It is clear from such testimony that the respondent's conduct in this Russian Church case was reprehensible in the extreme. He wilfully and deliberately violated an order of the Supreme Court. In his defense to this charge it is apparent that the respondent has been proven to have committed perjury."

This entire situation was brought to the attention of the Supreme Court, New York county, on a motion to punish respondent for contempt. Respondent was found guilty of contempt and for his failure to comply with the terms of the order adjudging him guilty of contempt he was arrested and incarcerated for thirty days. Subsequently that order was affirmed by this court (*Melnechuck* v. *Chemkowitz*, 218 App. Div. 727) and the appeal to the Court of Appeals was dismissed (245 N. Y. 529).

As to the second charge, the record discloses that on May 1, 1922, the Rynda Development Company entered into a contract to sell certain of its property in South Orange, N. J., to the Chemtec Company. Respondent was president of the Chemtec Company and signed the contract to purchase the property as such president. The purchase price named was $2,340, $160 paid at the signing of the contract, $780 to be paid on the passing of title, and the balance, $1,400, by the purchaser executing a purchase-money mortgage. Permission was given the buyer to erect a house on the property prior to the taking of title. The date for the passing of title was August 1, 1922. Following the signing of the contract, the Chemtec Company commenced the erection of a building as permitted under the contract. The time for closing of title was extended. The contract was assigned to Amalia R. Gluck, the wife of respondent. In October, 1922, an arrangement was made whereby the Franklin Society for Home Building and Savings agreed to make a loan on the property in the sum of $9,000. Respondent was in charge of all the arrangements.

Jacob Hauptman, a member of the bar of the State of New Jersey, and, at the time of his testimony herein, awaiting admission to the New York bar, testified that he was counsel for the Rynda Development Company; that respondent came to his office in the Prudential Building in Newark, N. J., on November 25, 1922, and told him that he had arranged with his father, Abraham Hauptman, the president of the Rynda Development Company, to have him, Jacob Hauptman, deliver to respondent the deed from the Rynda Develop-

ment Company for the property in question. Jacob Hauptman called his father on the telephone and then told respondent that he had been instructed not to deliver the deed to him, but if respondent had made arrangements with the attorney representing the Franklin Savings Society, he would deliver the deed to the Franklin Savings Society or its representatives. Jacob Hauptman and respondent then proceeded to New York, to go to the office of the society's attorney. The following is an extract from Hauptman's testimony: " Mr. Gluck and I then proceeded to New York by way of the tube, and while in the tube station, while in the tube train — Mr. Gluck said to me, ' Let me see the deed.' And I gave it to him. He looked it over and read it, and returned it to me. He then said, ' That you had better have a photostatic copy of this deed made before you deliver it to Hennessy [the attorney for the Franklin Society].' I told Mr. Gluck that I didn't see any need for that, and he said that since I didn't know Mr. Hennessy, and I didn't know him, there was no reason why I should leave a deed there without protecting myself in some way or other. I saw no reason for having a photostatic copy made, but I did not see any reason against it either, and Mr. Gluck took me to a place, the exact street I don't know, I think it is Warren Street, but it is a street parallel to Fulton Street, and it was within two blocks, I should say two or three blocks of Fulton Street, north of Fulton Street, and this place was west of Broadway, to the office of a photographer. * * * I gave the photographer the deed, and he put it in the machine and had a photostatic copy of it made, or a picture of it taken, and the deed was returned to me by the photographer, and Mr. Gluck and I then went to the office of Mr. Hennessy * * *." The interview with Mr. Hennessy resulted in the deed being left with him in escrow; the escrow receipt was dictated by Mr. Hennessy in Mr. Hauptman's presence, but Mr. Hauptman did not wait for the receipt, being in a hurry. The receipt was signed and mailed by Mr. Hennessy to Hauptman the next day. It reads: " Received from Rynda Development Company instruments as follows:

" Deed — Rynda Development Co. to Amalia R. Gluck
" Mtge — Amalia R. Gluck to Rynda Development Co.
" Bond — Amalia R. Gluck to Rynda Development Co.

" The above instruments referring to premises in the Village of South Orange, Essex County, N. J., on Rynda Road 177 feet from Ridgewood Road, are to be held in escrow and to be used as the closing instruments in the closing of the Franklin Society's loan to the said Amalia R. Gluck, in the amount of $10,000 to be closed on December 4th.

" On the delivery of the above instruments and the release from

the present blanket mortgage $780 out of the first advance on the said Franklin Society's loan is to be forwarded to the Rynda Development Co."

This receipt is dated November 28, 1922, is signed by F. H. Hennessy, and is on the letter head of Frank Hancock Hennessy, counselor at law, 15 Park row, New York city.

Hauptman's testimony is that respondent had left word at the photographer's that the photostatic copies were to be delivered at respondent's office; that he (Hauptman) got a letter from respondent either the following day or the second day following inclosing a copy of the photostatic deed and stating in his letter that he retained one for his records and was sending a copy to Hauptman.

Complications developed in connection with mechanics' liens on the property and title was not closed on the date named in the escrow receipt. Upon demand of Jacob Hauptman, Mr. Hennessy returned the instruments named in the escrow receipt, among which was the deed. Mr. Hauptman receipted for the instruments under date of December 21, 1922.

On December 26, 1922, respondent and his wife were informed by Mr. Hennessy that he had returned the deed to Mr. Hauptman. The loan from the Franklin Society was never closed, nor was there a closing of title under the contract of purchase and sale.

It appears that about two or three weeks prior to January 4, 1923, respondent attempted to record the photostatic copy of the deed in the office of the registrar of Essex county, N. J., but the registrar refused to record it. On January 4, 1923, there was recorded in the office of the registrar of Essex county, N. J., a mortgage covering the property described in the contract of May 1, 1922, between the Rynda Development Company and the Chemtec Company, which mortgage was executed by Amalia R. Gluck to her sister, Frieda Horn, and dated January 2, 1923. This mortgage contained a provision that a photostatic copy of the deed from the Rynda Development Company to Amalia R. Gluck was made a part thereof. In this way respondent was enabled to have recorded the photostatic copy of the deed. He testified that he did this " for the purpose of notifying anybody who might make an adverse claim. It was also for the purpose of asserting the claim to that property. * * * Asserting a delivery of the deed." Thereafter respondent publicly asserted that Amalia R. Gluck was the owner of the property by virtue of the photostatic copy of the deed on record. Respondent also obtained the keys to the house on the property from the tenants on the representation that his wife was the owner of the property, and entered into physical possession of the property. Eventually the Glucks were evicted from the

property on the authority of a decree of the Court of Chancery of the State of New Jersey.

Respondent's testimony is that on November 25, 1925, he made a tender, under the contract, to J. Lewis Fiacre, the secretary of the Rynda Development Company, and that on that day Abraham Hauptman, the president of the company, executed and delivered to him the deed in question; it was not acknowledged, but that in accordance with arrangements, on November 27, 1925, respondent met Jacob Hauptman at his office in Newark and Hauptman then signed the acknowledgment to the deed. At that time respondent arranged with Jacob Hauptman for the latter to come to respondent's office in New York and from there they would go to the office of Mr. Hennessy, the counsel for the Franklin Society. Respondent took the deed, which he had had in his possession since Saturday, the twenty-fifth, and proceeded to his office in New York, stopping at the photographer's to have a photostatic copy made of the deed (as a protection against loss by fire or depredation). Hauptman came to his office in New York in the afternoon and they proceeded to Hennessy's office, stopping *en route* at the photographer's, where respondent suggested that the photographer send Hauptman a copy of the deed. The photographer returned the original deed to respondent. Respondent and Hauptman saw Hennessy. Respondent gave Hennessy the deed. Hennessy promised to send a letter to Hauptman the following day in which he would promise to see that Hauptman got the balance of the purchase money and the proper second mortgage. There then developed a discussion regarding a blanket mortgage on the property, a release of which Hauptman promised to obtain. Respondent's testimony is that the closing with the Franklin Society was set for December 26, 1925, and he and Mrs. Gluck appeared at Hennessy's office on the twenty-sixth and then learned that Hennessy had given the deed to Hauptman; that Hennessy stated Hauptman had come to him and told him that the Glucks had made other arrangements and would not need the money from the Franklin Society and on Hauptman's representation that he represented the attorneys for the Glucks the deed had been turned over to him.

Respondent's testimony is self-contradictory and irreconcilable in essential details.

J. Lewis Fiacre, the secretary of the Rynda Development Company; Abraham Hauptman, the president of that company, and Frank H. Hennessy testified. Their testimony supports the testimony of Jacob Hauptman.

The issue of fact on the record as to the second charge against

the respondent is: Was there a delivery of the deed to respondent? The referee states: " The deed was never delivered to the respondent for any purpose except on the occasion in the train when Jacob Hauptman at Gluck's request handed it to him to read. The respondent Gluck obtained a photostatic copy of the deed by deceiving Hauptman as to the purpose for which he wished to have a photostatic copy made, which was to the effect that as neither Mr. Hauptman nor the respondent knew Mr. Hennessy, it would be well to have the photostatic copy made, in case anything happened to the deed." The record supports this finding of the referee.

This conclusion is reached independent of the prior judicial determination of the issue. In *Rynda Development Co.* v. *Gluck* (134 Atl. 370) the Court of Chancery of New Jersey (Vice-Chancellor Backes) said: " I am satisfied that the original deed was never delivered and that the recorded deed is a fraud." And as to respondent's right to possession of the property, in *Gluck* v. *Rynda Development Co.* (99 N. J. Eq. 788, at p. 804), the Court of Chancery of New Jersey (Vice-Chancellor Berry) said: " Having, in effect, stolen the deed, they [the Glucks] then attempt to steal the property represented by it, through the medium of the recording acts. Knowing that the register of deeds would not accept a photostatic copy of the deed itself for record, they resort to the scheme of executing a mortgage and attached this copy of the deed to it for purposes of reference, and in this way procured the deed to be recorded." (Affd., N. J. Ct. of Errors & Appeals, 100 N. J. Eq. 554.)

The respondent in his brief raises the following question: "Assuming for argument sake that respondent was guilty as charged of charge two, it is admitted and the charge does not claim otherwise, that he was not acting in New York, was not acting as an attorney of the State of New York and as the referee says: was acting in his own personal interests: ' it is clear however that respondent was the real party in interest,' why should this Court inflict and heap persecutions upon respondent for things which in no way concern his oath of office as an attorney of the State of New York, which in no way violated any law, and in which respondent lost a great deal of money? "

The best answer to that is the following quotation from *Matter of Rouss* (221 N. Y. 81, at p. 84): " Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards (*Selling* v. *Radford*, 243 U. S. 46; *Matter of Durant*, 80 Conn. 140, 147). Whenever the condition is broken, the privilege is lost. To refuse admission to an unworthy applicant is not to punish him

for past offenses. The examination into character, like the examination into learning, is merely a test of fitness. To strike the unworthy lawyer from the roll is not to add to the pains and penalties of crime. The examination into character is renewed; and the test of fitness is no longer satisfied. For these reasons courts have repeatedly said that disbarment is not punishment (*Ex parte Wall*, 107 U. S. 265; *Matter of Randall*, 11 Allen, 473, 480; *Matter of Randel*, 158 N. Y. 216; *Boston Bar Assn.* v. *Casey*, 211 Mass. 187, 192; *Matter of Durant, supra*). 'The question is,' said Lord MANSFIELD, 'whether, after the conduct of this man, it is proper that he should continue a member of a profession which should stand free from all suspicion' (*Ex parte Brounsall*, Cowp. 829). 'It is not,' he continued, 'by way of punishment; but the court, on such cases, exercise their discretion whether a man whom they have formerly admitted, is a proper person to be continued on the roll or not.' This ruling was announced after consultation with all the judges, 'as it is for the dignity of the profession that a solemn opinion should be given.' On that high plane the jurisdiction was thus early placed, and in that high spirit it has been exercised. Even pardon will not elude it. Pardon blots out the offense, and all its penalties, forfeitures and sentences; but the power to disbar remains (*Matter of an Attorney*, 86 N. Y. 563)."

In his capacity as an officer of the court, respondent has proven himself incapable of a proper appreciation of his duty to uphold the mandate of the court, and, on the contrary, has demonstrated that he considers such mandate a proper subject for contemptuous treatment. Furthermore, in an attempt to escape from responsibility for such conduct he has not hesitated at perjuring himself.

In his private capacity he has shown that he lacks honesty and fair dealing in his handling of his own personal affairs. One who acts thusly with his own matters is not likely to do otherwise when a client is involved.

To uphold the honor and dignity of the legal profession, where honesty and fair dealing are most essential, and to protect the public in its dealings with the members thereof, the court having found the respondent guilty on both counts as charged, he should be disbarred.

FINCH, McAVOY, MARTIN and O'MALLEY, JJ., concur.

Respondent disbarred.