In the Matter of FRANCIS FISCHER, an Attorney, Respondent. ADOLPH H. LANDLEY, Petitioner.

First Department, December 31, 1930.

*Adolph H. Landley*, petitioner in person.

*Max Zucker* [*John E. Leddy* of counsel], for the respondent.

DOWLING, P. J. Respondent was admitted to practice as an attorney and counselor at law in the State of New York, at a term of the Supreme Court of the State of New York, Appellate Division, First Department, on November 23, 1903.

This proceeding is unusual in that the charges against the respondent were not the subject of preliminary investigation by any committee of any bar association. The grievance committee of one of the bar associations of this judicial department declined to go into the matter on the ground that it did not come within the jurisdiction of the committee. The petitioner, although not a member of the bar, has most actively prosecuted the charges herein. The petition alleges as follows:

" *First.* That Francis Fischer has been for many years past and still is an attorney and counselor at law, duly admitted to practice in the Courts of the State of New York and is now engaged in the practice of law at #151 West 40th Street, New York City.

" *Second.* That said Francis Fischer and one Herman Mandel are the owners of and conduct a so-called club, known as Sylvan Social Club, at No. 3801 Broadway, New York City, where games of chance, to wit, card games for large stakes are conducted for the sole gain and benefit of said proprietors. These proprietors collect from each of the players a fee for the privilege of playing at each of the two daily sessions and themselves participate in such games almost daily. There are no membership fees, or any of the usual functions of a social club.

" *Third.* During the summer of 1924 I was solicited by said Francis Fischer to partake of card games in this Club, where I played with him and others intermittently until 1928, losing more than $8,000, paid to said Fischer and Mandel, and I have been informed that I was cheated.

" *Fourth.* That deponent has started an action against the proprietors for the recovery of his losses, but prior to its commencement had offered a full release to said Fischer and Mandel, provided said Fischer would discontinue his connection with these activities, so unbecoming an attorney, who is in active practice and an officer of the law.

" *Fifth.* That both proprietors refused this proposition and threatened deponent to ' have him beaten up and his ears cut off ' if he dared to bring this action.

" *Sixth.* That in the opinion of deponent such activities of anybody and especially on the part of an attorney at law are illegal and tend to diminish the respect for the legal profession, both in the eyes of the hundreds of people visiting this Club and the neighborhood of said gambling house.

" Wherefore, deponent requests this Honorable Court to cause an investigation to be made of the facts herein alleged."

Respondent filed his own affidavit in opposition to the petition, whereupon one of the official referees was appointed to take testimony in regard to the charges and to report the same with his opinion thereon. The official referee has duly reported and the matter is now before the court on a motion of the petitioner for such action as this court may deem just and proper.

We are not now concerned with the petitioner's alleged loss of some $8,000. That was the subject of an action by the petitioner against the respondent, the complaint in which action was dismissed on appeal by this court (*Landley* v. *Fischer*, 226 App. Div. 352) on the ground that the real purpose of the action, although the complaint alleged fraud, was to recover money lost at gambling.

The official referee, at one of the hearings before him, stated that the only question before him was, " Is it ethical or unethical for a lawyer to have a monetary interest in a Club of such a character as that of the Sylvan Social Club," and he endeavored to limit the parties to that issue.

It appears that respondent had been accustomed to frequent what was known as the St. Marks Café. It was a Hungarian restaurant, and had a restaurant part, and a café part in which cards were played. In 1921 this place not only became overcrowded but there was an element there which respondent's group did not care about. One Louis Fine was induced to provide similar accommodation in a building opposite the St. Marks Café. Respondent organized the Sylvan Social Club in December, 1921. Its objects, according to the certificate of incorporation filed with the Secretary of State, are (1) to foster the spirit of sociability and fraternity amongst the members; (2) to arouse interest in civic problems confronting the residents of Washington Heights. The newly organized Sylvan Social Club under date of January 11, 1922, entered into an agreement with the Louisil Corporation (controlled by Fine) which recited, in part, as follows:

" Whereas, the party of the second part is the owner of premises heretofore furnished as a restaurant and cafe, on the northwest corner of 158th Street and Broadway, Borough of Manhattan, City of New York, and

" Whereas the party of the first part is a social organization desiring the exclusive use of the premises owned and operated by the party of the second part,

" Now, therefore, it is hereby agreed as follows:

" I. That the party of the first part shall have exclusive use for itself and its members of the premises above described, owned

and operated by the party of the second part, hereinabove mentioned.

" II. That the party of the second part is to render services to the party of the first part and its members, by keeping the premises open daily between 12 noon and 1 A. M. excepting on Saturdays, when the premises are to be open from 12 noon until 2 A. M. for the exclusive use of the party of the first part, and its members.

" III. The party of the first part agrees to expel any and all members whose names are submitted to it by the party of the second part as being objectionable to the said party of the second part."

When the club was formed some attempt was made at formality and regulation of membership; applications were required, payment of dues called for, etc., but that was quickly dispensed with. It would seem that the club was organized solely for the purpose of controlling the privilege of frequenting the place furnished by Fine. The arrangement worked out satisfactorily until 1924 when some dispute between one of respondent's friends and Fine developed. Respondent then purchased from Fine all the latter's interest in the place, taking from him an assignment of his lease and paying him $3,000 in cash, and the balance of $10,000 he agreed to pay in installments. By this time, the record indicates, all pretense of " club " organization had been abandoned, and " Sylvan Social Club " was just a name applied to the establishment of which respondent became proprietor. Respondent testified his purpose in buying Fine's interest was to place his father-in-law there, but family difficulties made that impossible. Almost immediately a one-half interest was sold by respondent to one Herman Mandel. The extent to which respondent participated in the actual management is not shown. Whether he was conspicuously present and actively directing is not shown. It was proven that he and members of his family ate meals there, and that he participated in the card playing, but what else he did is not established. Respondent endeavored to dispose of his remaining half interest. There is testimony that he had been offered $10,000 for this half interest, but the transaction did not go through. Respondent testified that he finally disposed of all his one-half interest in the place in September, 1928, for $3,000 to Herman Mandel.

One of the petitioner's witnesses described the physical lay-out of the Sylvan Social Club, which was located at 3801 Broadway, corner of One Hundred and Fifty-first street, as follows: " You had to walk up a flight of stairs, and there was a door, and one large room that had possibly twelve to fifteen tables in it. There was

a small room to the right of that." The witness imagined there were some tables in that room. There was a kitchen attached to the club, and food was served there. Respondent testified there were seventeen tables in the place, thirteen in the large room and four in the small room. Respondent described the method of playing as follows: " Mr. Landley would come in, and he would say to the waiter, ' Bring us some pinochle cards and set up a pinochle game.' The chips were free. They were held in boxes, anybody could take them. The waiter rendered service by putting them together, as the players wanted them, and handing them out each end of the table and bringing the cards. They either bought two decks of cards or four decks of cards, or they either called for two cigars apiece or three cigars apiece. * * * For two decks of cards — they generally took two decks of cards — I think they had to pay $2 for the two decks of cards and $3 for the cigars." Respondent further testified: " The patrons, they paid for the services, there were two waiters to serve on them, water or whatever they wanted." The method of payment is described in the following extract from the record:

" The Referee: What did they pay for the services? The Witness: They generally checked off fifty cents for the omnibus, the assistant waiter, and seventy-five cents for the head waiter, that would be $1.25, averaging about twenty-five cents a player. The Referee: They took that off when? The Witness: They took that off the money that was set aside to pay 350 bid or over. By Mr. Zucker: Call it a kitty? A. Yes, call it a kitty. Pinochle players, when they bid 350, which is large bid, generally have a prize, and the prize is $5 in chips, whatever they play for, whether 6 1/4, if they are playing 25 cents, why it means $1.25, they get that $1.25 out of the money that is set aside, so that when there are three playing, instead of each man paying the charge against himself, they generally leave that aside, so when the waiter is called, when the gentlemen are through playing — they may take the cards and chips — why, he applies that money they are to pay, and it is $6.25, the total, I can tell you better the separate charges, $6.25 — The Referee: For what? The Witness: Two decks of cards and cigars, and it is $9 for four decks and cigars. So that he either applies that money there or if they wait for him, for the waiter, why, he deducts it, because the difference between what one may lose and the other man would win would always have to leave in his hands the money that was set aside to pay the expenses. * * * The Referee: What I want to get at is what is the average earning of a table a night, or in that way that you have described? The Witness: In that way it was absolutely

impossible — I do not believe it has ever happened that there should be two games at one table. By no means were all the tables filled at one time. There were accommodations for a few. There were no more than, in the weekdays, three or four games a night. Saturday nights and Sundays is it a little different. Saturdays and Sundays it has varied from seven games, possibly to eleven or twelve at the greatest time. * * * The Referee: I am in ignorance about card playing. I wanted some information. Q. In the playing of pinochle, there was never, in auction pinochle, less than three men? A. Never less than three. They have to have three. Q. Usually four? A. Usually four. Q. And when you say they would sit down for a sitting, they would sit at that one table? A. For the entire night. Q. And that was the only charge they would get on that table? A. The only charge. If they had anything or ordered anything, a sandwich or coffee or anything that they wanted, they paid for it."

There was testimony by one of petitioner's witnesses that it was not necessary to play for money, that the players could play a sociable game without money.

There is no testimony that the establishment participated and profited to the extent that it took a part of the winning in each particular play.

There is testimony that respondent played cards there. This testimony does not indicate that his participation in the card playing was on a basis different from that of the other players. There is testimony that there had been an individual in the club who looked at the cards of some of the players and signaled to other people. It is not shown that respondent was one of those benefiting by such conduct. Nor is it shown that respondent countenanced cheating in any form at the club.

The police evidently regarded the establishment with suspicion. The proof is that the police called on five different occasions in 1925, viz., March twenty-first, March twenty-eighth, April fourth, April eleventh and April eighteenth. On the last date the place was raided. Respondent's testimony relating to these calls and raid is as follows: " Now, on March 21, 1925, a squad, a special squad coming from the central office, I think they had a Central Squad Bureau at that time, Vice Squad they called it, came upon a complaint. This squad was headed by a police lieutenant whose name I don't remember, and had four or five men with him, came Saturday night, I think on March 21st was Saturday night, about 11 o'clock, and looked the place over. He looked it over, looked over the books, looked over the place and he said, ' Well, there is no reason, there is nothing wrong going on here. There is nothing

illegal that we can see,' and they left. Saturday later, on the 28th, another squad appeared and the same thing happened, under a different lieutenant or sergeant. * * * On April 4th, another one appeared. And on the 11th of April, a fourth appeared with the same results. Now, after the second or third visit I felt that the thing was inspired by the gentleman across the street or by someone else who had a personal grievance against somebody. * * * So I went down to see Samuel G. Belton, who was the Deputy Chief of Police, in charge of that special squad, down in Elizabeth Street, and Mr. Belton could not see me, and he turned me over to Deputy Commissioner, Inspector, rather, named Zanes, and Mr. Zanes and I had a talk in which I described to him this place. I told him just exactly what was being done there, and what the members did, and what kind of a place it was. I told him it was a taxpayer with eight large windows on one side, where there was another taxpayer, where anybody could get on that roof or shed and look in."

" The Referee: You mean there was an adjoining taxpayer? The Witness [respondent]: Another adjoining taxpayer where anybody from the neighboring tenement house, apartment houses, could step right on that roof and walk over to our windows and look right in, and that these windows were always open, and that anybody could stand there and look and watch and see everything that is going on in the place. The Referee: In consequence of that explanation what did he say or do? The Witness [respondent]: If there is anything illegal, that direct evidence could be gotten, and there was no need of any sensational raids, that somebody is trying to inspire it. Mr. Zanes assured me that he knew of the place, and that no raid would take place, and that if any investigation of any complaint has to be made, it would be made in the way I suggested. And I also suggested that a plainclothesman come in any time, and if I am there ask for me, and I would introduce him as a friend of mine, walk away with another plainclothesman, so that nobody would know, and he could stay there, watch and see that there was nothing illegal done there or wrong in any way. And he assured me that nothing would happen. But the very next week, another squad appeared, a raid was made. Some forty-four gentlemen were taken to the police station, to the district police station."

They were charged with disorderly conduct, disturbing the neighbors. No charge of gambling was made. The magistrate before whom the case was brought dismissed the charges.

It appears, also, that this establishment was the scene of a hold-up by gunmen. One card player who sat near an open window jumped

out, as did one of the assistant waiters. One of the hold-up men fired a shot. This happened in August, 1925.

In *People* v. *Bright* (203 N. Y. 73) the court said: "Whatever may eventually be determined to be the extent of the participation in gambling or banking games which is necessary to make a person liable under this provision [section 970] of the Penal Law ▉ for engaging therein as player, we are quite clear that a person who merely takes part in a game or series of games of poker on precisely the same terms as the other participants in the game, for mere amusement or recreation and not as a professional gamester, does not thereby become a common gambler under our statute." The record herein is not sufficient to stamp respondent as a professional gamester.

Neither does the record convince us that the establishment was a gambling house, in the iniquitous sense. Cards were played for money, it is true, but petitioner's witness Rosenthal made it quite clear that it was not essential to play for money and a social game could be indulged in. And it is quite clear that when cards were played for money, the sums of money involved were small. The restaurant feature of the place and the frequenting of the establishment by the wives and women folk of the players also help fix its character. There is nothing in the record to indicate that the place was in any way disreputable. Nor was there any pool or "kitty" taken out, to constitute common gambling.

The respondent is a Hungarian by birth. He arrived in this country at an early age. By his own efforts he obtained an education here, became a school teacher and then studied law and was admitted to the bar. His high character is attested to by people of standing in the community. We presume that he himself entertained some doubt as to the propriety of his continuing to be identified as part owner of the "Sylvan Social Club." The testimony is that he disposed of all his interest in the establishment in 1928. The informal method of consummating that transaction left the official referee with doubt as to the genuineness of the alleged sale and transfer. The official referee, in his report, said: "Assuming, however, that respondent has divested himself of all interest in this gambling Club. I am of the opinion that for his sole and later half ownership of such Club between the period 1924 to 1928 he should be severely censured and, in addition, should be in set terms admonished that while he remains an attorney any proprietary connection with this Club, or any similar club, direct or indirect, secret or open, will, upon proof thereof being made, result in his immediate disbarment."

The report further states: " Respondent argues that the morals of an attorney are not the subject of discipline, that many prominent members of the Bar in this country and in England were notorious for their dissolute living, drunkenness and immorality, and cites cases tending to support, as I understand it, his claim that only those actions which are done in the course of his profession and which tend to degrade the profession are proper subjects of investigation and discipline. It is undoubtedly true that in the present and in the past members of the legal profession have led open and notoriously immoral and dissolute lives and were in some instances notorious gamblers without being subjected on this account alone to investigation and disbarment. *Tempora mutantur, et nos mutamur in illis.* Here and now in the present day there is a clear determination in the Courts and even in the Bar itself to hold its members to a higher standard of living than formerly prevailed and to exact from them such standards of conduct as will not tend to lower the Bar in the public estimation or tend to bring disgrace upon the profession. There have been lawyers and judges in the past who with great talents had great vices. But in all the history of lawyers, past or present, I venture to say there is no reported instance where a lawyer was permitted to remain a member of the Bar and at the same time be known and shown to be the keeper of a brothel or the proprietor of a gambling house. This respondent was undoubtedly the proprietor of a gambling club from 1924 to 1928, when he claims he sold out his interest."

Nothing in the record indicates that respondent's ownership of this club was in any way specifically identified with his standing as a member of the bar. That does not preclude the court from reviewing the conduct complained of. This court, in *Matter of Gluck* (229 App. Div. 490), found occasion to quote from *Matter of Rouss* (221 N. Y. 81) the following: " Membership in the bar is a privilege burdened with conditions. A fair private and professional character is one of them. Compliance with that condition is essential at the moment of admission; but it is equally essential afterwards (*Selling* v. *Radford*, 243 U. S. 46; *Matter of Durant*, 80 Conn. 140, 147). Whenever the condition is broken, the privilege is lost."

In *Matter of Wilson* (78 Kan. 450) it was said: " * * * It is, however, one of the requisites for admission to the practice that the candidate should present evidence to the court that he is a person of good moral character, and it would be a great stigma upon an honorable profession if the members of it were powerless to purge it of any who may have been improvidently received into its fold and whose after life is offensively corrupt or whose business trans-

actions, even outside of the courts, are characterized by dishonesty; in short, that the profession is compelled to harbor all persons of whatever character who have gained admission to it and are fortunate enough to keep out of jail or the penitentiary."

It would indeed be a travesty if the court were powerless to restrain rogues from parading as its officers, simply because they were clever enough to divorce their professional lives from their private lives. To warrant disciplinary action by the courts, however, it must be shown that the conduct complained of is such as to render the attorney unworthy of the great trust and confidence generally accorded to the members of the profession, or that the conduct is so bad as to scandalize his profession or the courts in which he practices. (*Matter of Elliott*, 73 Kan. 151.)

On the record before us we are not satisfied that respondent was, during the time in question, either a common gambler or the keeper of a gambling establishment, within the meaning of the criminal statutes. But any game of cards for stakes is technically gambling, and respondent degraded his profession by maintaining his interest for some years in a resort maintained for the purpose of playing cards for money stakes. We do not think respondent's conduct in holding a monentary interest in this " club " is in keeping with that of a member of the profession conscious of the dignity and standing of his calling, and we think we are inclining to the side of mercy in suspending him from practice for the period of one year, with leave to apply for reinstatement at the expiration of that term upon proof of his compliance with the conditions incorporated in the order.

MERRELL, FINCH, MCAVOY and SHERMAN, JJ., concur.

Respondent suspended for one year.