THE PEOPLE OF THE STATE OF NEW YORK *v.* JULIAN PACK, MORRIS BLUM and MILDRED CINER, Defendants.

Court of Special Sessions Held by a City Magistrate of New York in West Side Court, Borough of Manhattan, November 11, 1942.

*Frank S. Hogan, District Attorney (Lauren McKenna* of counsel), for the People.

*Manahem Stim* for defendants.

LEVIS, C. M. The defendants, allegedly acting in concert, are charged with the offense of keeping a room to be used for the purpose of gambling in violation of the provisions of section 973 of the Penal Law.

The three defendants were respectively the manager, steward, and hostess of an incorporated membership corporation known as the Unity Contract Bridge Club, Inc., which maintained spacious and pretentious club rooms at 2121 Broadway in New York city. Throughout this opinion, for the sake of brevity, the Unity Contract Bridge Club, Inc. will be denominated merely as the Club.

The Club is a nonprofit, social, membership corporation with a full set of officers, a president, secretary, treasurer, executive committee, membership committee and house committee, all of whom come from the membership list of the Club and who manage and control the Club's activities. It is no different from the many social clubs which are so common in large cities. To become a member, the applicant must sign an application blank and presumably is subject to acceptance or rejection by the membership committee. There is no initiation fee required but the member is expected to pay a small nominal annual-dues charge, which as in many Clubs is disregarded in many instances and not strictly required to be paid as a continuance of membership.

The membership roll contains twelve hundred names and throughout the trial there has been no suggestion that any disreputable persons belong to the organization; there is no charge that the Club is a place where professional gamblers assemble and congregate, or that the Club's charter is a mere blind to cover the professional activities of common gamblers. The court has before it a mere social club of a responsible and reputable character at which the members play games of cards. *None but members of the Club are permitted to play,* so that the disreputable, so-called " tinhorn," element of the community is excluded.

The Club maintains a restaurant where its members may obtain food, and the testimony discloses that three card games are played — contract bridge, pinochle, and gin rummy. The revenue of the Club to pay the rental of the spacious club rooms, the heat and light and the employees, is obtained from the members who play. Each member pays fifty cents as he or she sits down to play and each table of three or four, as the case may be, receives a deck of cards from the Club at the time of playing.

The members may play a mere social game at which no money passes but, undoubtedly, the vast majority of the games played were card games for stakes. The betting upon the play, however, is entirely at the discretion of the club members.

There is but one feature of the entire testimony which connects the Club itself with the gambling acts of its members. Allusion has been made to the fact that the revenue of the Club is obtained from the members who play and that the sum of fifty cents is charged each player for his seat. There are two interesting exceptions. If the players play bridge and the stakes are one-tenth of a cent per point, the charge is raised to seventy-five cents per seat, but it remains at fifty cents where the stakes played for are one-twentieth of a cent per point. If the game of gin rummy is being played and the members set a ten-dollar limit of loss for the entire sitting, the seating charge is one dollar; while if the limit of loss set is three dollars, the charge is fifty cents. The difference in the amounts played for makes no difference in the charge in the case of pinochle-playing.

It will be noticed that no pool or "kitty" is taken out from the various plays and the Club obtains no profit from the winnings of each particular hand or play, or from the winnings or losings of each particular player. Regardless of who may win or who may lose, all pay a fixed charge for cards and clubhouse privileges, varying only as to stakes played for by the Club members.

The very small stakes in the contract-bridge game and the ten-dollar limitation of loss on the gin-rummy game indicate the smallness of the game so far as the gambling feature is concerned, and point to the fact that the games were played for pleasure and sociability with the gambling element as a mere incident. The gambling stake was more a deterrent to reckless bidding or playing, rather in the nature of a penalty for such reckless bidding, than the end in itself of the play. The real end sought by the Club was the pleasure derived from the play itself and its expert possibilities and the social intercourse of its members.

In making this last statement, the court does not wish to be interpreted as holding that the smallness of the stake is the determining factor in deciding whether a place is a gaming establishment. The fact is mentioned merely as one element. This court can well envision a case where the so-called game of craps played for pennies, depending upon the mere fall of the dice, is gambling and a place maintained to encourage or permit the play would be a gaming establishment within the meaning of the statute.

The evil which the constitutional provision against gambling [State Const., art. I, § 9] and the legislative enactments [Penal Law, art. 88] chiefly condemn is the betting and gambling organized and carried on as a systematic business. The State of New York regards gambling as a pernicious practice and it desires to stamp with its disapproval an idea that a livelihood may be earned by any other means than hard, honest, industrious effort. The public policy of our State seeks an encouragement of thrift and industry and a discouragement of idleness and profit or livelihood from chance.

It is the duty of the court to stamp out the gambling evil which carries in its wake vice, immorality, and crime. From this duty this court does not shrink; in fact, the court is happy to be a means toward the suppression of a practice so demoralizing as gambling.

The present case, however, lacks entirely the commercial aspect and the organized professional feature. There is no element of disreputableness either in the conduct of the Club or in the character of its membership.

It is true that " any game of cards for stakes is technically gambling " (*Matter of Fischer*, 231 App. Div. 193), but the mere play of a game for stakes at a certain place does not make the place a gambling establishment within the provisions of the Penal Law.

The mere playing of a card game for stakes or for amusement, unconnected with the commercial or professional aspect, does not make the player a common gambler within the provisions of section 970 of the Penal Law. (*People* v. *Bright*, 203 N. Y. 73.) In the opinion of this court the same rule applies to gambling establishments. (*Matter of Fischer, supra.*)

In this latter case, the Appellate Division had before it the question of disbarment of an attorney who owned a half interest in a gambling club known as the Sylvia Social Club, where all club organization had been abandoned and the very club title was just a name applied to the establishment, of which the

attorney was a half owner. There was a similar arrangement as to paying for the place at each table as occurs in this case and a reading of the opinion, at page 197, shows clearly that the employees were paid by the players from the excess fund set aside to meet bids of 350 or over in the game of pinochle played.

Dowling, P. J., in summing up the matter said:

"Neither does the record convince us that the establishment was a gambling house, in the iniquitous sense. Cards were played for money, it is true, but the petitioner's witness Rosenthal made it quite clear that it is not essential to play for money and a social game could be indulged in. And it is quite clear that when cards were played for money, the sums of money involved were small. The restaurant feature of the place and the frequenting of the establishment by the wives and womenfolk of the players also help fix its character. There is nothing in the record to indicate that the place was in any way disreputable. Nor was there any pool or 'kitty' taken out, to constitute common gambling. * * *

"On the record before us, we are not satisfied that respondent was, during the time in question, either a common gambler or the keeper of a gambling establishment, within the meaning of the criminal statutes."

In the present case every favorable feature of the *Fischer* case appears and, in addition, we have a membership corporation as owner, with the playing limited to legitimate club members. The Club is not a mere name, but a real operating entity. The profit realized from operation, if any, belongs to the membership corporation and its members and not to any individual.

There is a second weakness in the case as presented in addition to the fact that, as a matter of law, it is doubtful as to whether this is a gambling establishment.

The defendants are three paid employees of the Club, having fixed salaries. Julian Pack is the manager of the two rooms in which contract bridge and gin rummy are played. Morris Blum is the manager of the room in which pinochle is played. Mildred Ciner is the hostess who performs the functions which the name indicates. Each receives a fixed salary and this salary does not depend in any wise upon the stakes played for by the members.

None of the officers of the Club or its executive committee are before me. Certainly the officers and executive committee of a membership corporation have the control and management of the Club's activities. The paid employees are subject to the

direction of the corporate board. The pertinent question to be asked is why the employees are charged with a misdemeanor, and not the responsible directing heads.

The record does not disclose that these employees took any part in the games; on the contrary, the hostess but introduced members to each other and seated them at the tables. The court prior to this opinion dismissed the case against the hostess and the same ruling requires a dismissal of the charge made against Morris Blum, the so-called steward. He had charge of the pinochle room and there was no differential as to the charges paid by the players. Each pinochle player paid the club fifty cents per sitting regardless of the stakes. Neither of these two persons took any part in the gambling play and one might, with equal justice, arrest the chef in the restaurant for conducting a gambling establishment. They knew that the members in most instances played for stakes. The chef and his assistants had the same knowledge.

Section 973 provides: " Any corporation or association or the officers thereof or any copartnership or individual, who keeps a room   *   *   *   used for gambling   *   *   *   or being the owner or agent, knowingly lets or permits the same to be so used, is guilty of a misdemeanor."

The section clearly condemns the corporation and expressly states the officers thereof who keep the gambling room. The word " individual," used in this context, does not mean a mere paid employee but covers the case of an individual who maintains a gambling house and makes it clear that the statute covers every proprietor of a gambling establishment whether the proprietor be a corporation, firm, or individual.

To bring any other than the owner or proprietor into this proceeding, one must look to section 27 of the Penal Law. This section provides: " A person who commits or participates in any act which would make him an accessory if the crime committed were a felony, is a principal and may be indicted and punished as such, if the crime be a misdemeanor."

Are the paid employees in this case who take no part in the gambling, who do not make or suggest the stakes, who have no share in any of the " spoils " of the play, but who receive a fixed salary, accessories?

An employee who has no control over the premises where the gambling is carried on, or of the business conducted therein, is not punishable. (*People* v. *Mitchell,* 49 N. Y. State Rep. 528; *People ex rel. Sturgis* v. *Fallon,* 4 App. Div. 76; affd., 152 N. Y. 1.)

It is only where it is shown that the defendant leased the

gambling premises or where he exercises custody and control of the premises that he can be found guilty. (*People* v. *Trainor*, 57 App. Div. 422.)

The court is satisfied that none of the three defendants on the proof submitted had control or authority over the business or policy of the Club. The executive committee and the officers directed the policy.

A third complication appears from the facts. Prior to the filing of the present complaint, the District Attorney had submitted this case to the grand jury of the county of New York. The grand jury declined to indict. It was stipulated at the close of the People's case that the identical charge now submitted to the Magistrate had been made before the grand jury. It was alike stipulated that the same witnesses gave the identical testimony before both the grand jury and this court.

The defendant urges that the Magistrate must dismiss the case, in view of the prior submission to the grand jury and its failure to indict.

This is clearly the rule of law in the case of a felony. The reason for the rule in the case of a felony is that the Magistrate, in hearing the case, has only one function, either to discharge or to hold the defendant for a grand jury hearing. It would be idle for the Magistrate to hold a defendant for grand jury indictment in a case where the grand jury had already investigated and had found that no indictment should issue.

The question presented in this case is whether the same rule applies to a misdemeanor. Is the Magistrate who has summary and plenary jurisdiction of a misdemeanor compelled to dismiss the case because the grand jury declined to find an indictment on the same charge?

Section 270 of the Code of Criminal Procedure provides: "Effect of Dismissal.— The dismissal of the charge does not, however, prevent its being again submitted to a grand jury as often as the court may so direct. But without such direction, it cannot be again submitted."

The word "charge" in the statute is not limited to a felony; it covers alike a misdemeanor. (*People* v. *Bogdanoff*, 254 N. Y. 16.)

A literal reading of section 270 would require the construction that it is applicable only to a resubmission of the charge to a second grand jury and that it has no application to a submission of the same charge to another tribunal, such as a Magistrate. This court, however, is not inclined to follow the letter of the law, where a narrow technical construction would destroy its spirit. (*People ex rel. Flinn* v. *Barr*, 259 N. Y. 104, 109.)

The only difference between the information, which brings on the trial before a Magistrate sitting as a Judge of Special Sessions, and an indictment is that in the one case a competent public official presents the charge, and in the other the grand jury presents the charge. The distinction is merely the source from which the charge comes. (*People ex rel. McSherry* v. *Enright,* 112 Misc. 568; affd., 196 App. Div. 964; *People* v. *Carrie,* 122 Misc. 753.)

The dismissal of a charge by a grand jury establishes that after a full hearing and the taking of evidence the grand jury has found, as a conclusion of fact, that the evidence should not be submitted to a trial jury. (*People* v. *Kelly,* 140 Misc. 377.)

The dismissal certainly cannot have occurred because of misunderstanding of the law applicable to the charge, for the District Attorney is the legal adviser of the grand jury. It must be conclusively presumed that the grand jury dismissed the charge because the facts presented did not warrant an indictment.

In effect, the present proceeding asks this court, acting as a Court of Special Sessions, to review the findings of fact of the grand jury. It is not urged that the grand jury has failed to give the case a complete and impartial investigation, for the stipulation states that the identical testimony given by the same witnesses was before both bodies.

Is there not the danger, suggested in the case of *People* v. *Dziegiel* (140 Misc. 145), that: " If grand juries were to understand that their work was merely perfunctory and that the court, upon its own motion or upon the recommendation of the district attorney, was likely to set aside or overthrow their findings, with no judicial grounds for so doing, the efficiency and effectiveness of our grand jury system would soon disappear? "

The decision of the grand jury is justly entitled to great weight and should not be brushed aside or ignored. (*People* v. *Neidhart,* 35 Misc. 191; *People* v. *Kowalski,* 159 Misc. 493.)

The spirit of the law was to prevent the District Attorney, because he did not agree with the grand jury, from repeatedly resubmitting complaints until he could obtain a grand jury which would agree with him. A prosecution under the old system, prior to the enactment of this statute, might well become a persecution by continuous repetition of the charges. The spirit of the law and the intention of the Legislature, in the judgment of this court, are that when a case has been submitted to the grand jury it should not be submitted to a second grand jury, or be submitted to any other court, unless new and substantial facts

are found which would warrant such submission and then only in case those facts are set before the court and the new submission authorized.

I do not, however, dismiss this case against the final defendant, the manager, alone upon the question of law as to the resubmission to a Judge of Special Sessions; but I dismiss the case alike upon the further ground that where the grand jury, with the identical facts, with the identical witnesses, and with the identical charge before it, has found that no crime was committed which warranted the submission of the case to a grand jury, this finding of the grand jury, alone, inevitably causes to arise a reasonable doubt as to the guilt of the defendant. Twenty-three men, assembled as a grand jury, a constitutional body having plenary powers of investigation, have answered the question presented to this court with an emphatic negative. This court certainly feels that that negative answer by the grand jury requires a Judge of Special Sessions, as a trier and finder of the facts, to give to the defendant the benefit of the doubt which the finding of the grand jury causes to arise in the mind of this court.

This decision does not in any wise question the recent decision of Judge AURELIO in the case of *People* v. *Welti* (179 Misc. 76). It was decided in that case that a person who maintained a room in which duplicate bridge was played and where the winner of the contest received, out of the fee paid by each player, a certain prize, acted in violation of section 973 of the Penal Law. There is no suggestion in the present case that any prize money was paid to the players by a person who maintained a room for gambling. There is no question in the *Welti* case of submission to the grand jury; and the gambling part of the *Welti* decision is not an arrangement made between the players, themselves, without the intervention of the gambling house, but rather is one in which the stake received by the winner is paid by the gambling house, itself, from the fees which it receives.

The defendants are discharged.